# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-877

STATE OF LOUISIANA

VERSUS

TANYA BUTEAUX

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 13-2074
HONORABLE ANTHONY THIBODEAUX, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Elizabeth A. Pickett, Judges.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

**M. Craig Colwart**
**St. Mary Parish Indigent Defender Board**
**P. O. Box 1226**
**Franklin, LA 70538**
**Telephone: (337) 828-3628**
**COUNSEL FOR:**
    **Plaintiff/Appellee - State of Louisiana**

**M. Bofill Duhé**
**District Attorney – 16ᵗʰ Judicial District**
**W. Claire Howington**
**Assistant District Attorney – 16ᵗʰ Judicial District**
**300 Iberia Street – Suite 200**
**New Iberia, LA 70560**
**Telephone: (337) 369-4420**
**COUNSEL FOR:**
    **Plaintiff/Appellee - State of Louisiana**

**Richard Allen Spears**
**101 Taylor Street**
**New Iberia, LA 70560**
**Telephone: (337) 367-1960**
**COUNSEL FOR:**
**Defendant/Appellant - Tanya Buteaux**

**THIBODEAUX, Chief Judge.**

Defendant, Tanya Buteaux, appeals her jury conviction of three counts of theft of $1,500.00 or more, violations of La.R.S. 14:67. The trial court sentenced Ms. Buteaux to five years at hard labor on each count, to be served concurrently, with all but two years suspended, and five years supervised probation upon release from incarceration. The court also ordered Ms. Buteaux to pay restitution to the victims in the amount of $89,186.63.

We affirm her convictions and sentences and remand with instructions.

## I.

## ISSUES

Ms. Buteaux raises only one issue on appeal:

whether the evidence was sufficient to support a guilty verdict on all three counts of theft?

## II.

## FACTS AND PROCEDURAL HISTORY

Ms. Buteaux managed the Spanish Lakes One Stop gas station convenience store in New Iberia. The State alleged that Ms. Buteaux stole almost two hundred fifty thousand dollars from the store between January 1, 2011, to April 30, 2013.[1]

---

[1] In the amended bill of information, the State charged Ms. Buteaux with three counts of theft of $1,500.00 or more, committed "including and through the dates of January 1 through December 31 of 2011" (Count #1), "including and through the dates of January 1 through December 31 of 2012" (Count #2), and "including and through the dates of January 1 through April 30 of 2013" (Count #3).

The State presented evidence of theft perpetrated through a scheme whereby Ms. Buteaux manipulated daily store statements (reconciliation sheets) to short the cash deposits. The State first called George J. Trappey III, a certified public accountant who was qualified as an expert in accounting and tax preparation. In his testimony, Mr. Trappey stated that he prepared the tax returns and financial statements for the store in 2010, 2011, and 2012. He then explained how he first discovered a problem while preparing the store's 2012 business tax reports:

> Okay. When I was doing the 2012 year-end work, which I would have been working on in late March or early April of 2013, they have an account called "cash transfers". And what happens is, off of these monthly reports, all of the sales activity are recorded. And the total cash that should have been deposited in the checking account is shown as a debit to this cash transfer account where it's based on those computer reports off the store system. This is how much cash should have went in the bank. Then, as they make deposits, that cash transfers account is credited or reduced for the actual deposits.
>
> And so what happened during 2012 is, that cash transfer account just kept building a balance. And when we got to the end of the year, there was a $68,000 balance left in that account that I couldn't explain why that balance was still there and why all of the cash that should have been deposited wasn't being deposited. So we had this $68,000 unexplained difference that we couldn't figure out. So it just got me concerned. And so that's really when I called Mark Musso and said, "Mark, there's something not right. We've got this balance in this cash transfer account that I can't explain. And, you know, it's too big of an amount to just adjust." And so that's when he kinda started digging into the records at the store.

After this discovery, he looked at the monthly reports generated by the store's computer to see "what the sales . . . were . . . based on what the registers . . . sa[id] they should be" and compared them to what the sales were based on the

accounting records. Based on his review, he found a discrepancy of "$16,000" in 2010, "$48,699" in 2011, and "$101,626" in 2012. When asked if it was possible that Susan Musso, who prepared the general ledger, may have been making mistakes in her accounting, Mr. Trappey agreed that it was possible but stated that "on my professional opinion, being a CPA for 43 years, you know, to me, the difference was a shortage that had to be accounted for by theft."

Mark Musso and his wife, Susan, co-owned the convenience store with another couple. The Mussos were responsible for operating the store, and their partner was responsible for all the legal aspects of owning and operating a gas station convenience store. Mr. Musso testified that Ms. Buteaux worked at the store from 2002 until 2013. She started as a cashier, then moved up to manager in 2007 or 2008. According to his testimony, Ms. Buteaux grossed five hundred dollars a week plus bonuses and was given a gas fill-up once a week.

As manager, one of Ms. Buteaux's responsibilities was preparing the cash deposits daily, which consisted of cash and checks only. Her work schedule was from 5:00 a.m. to 1:00 p.m. Between 5:00 a.m. and 7:00 a.m., Ms. Buteaux prepared the previous day's cash deposit, after which she would lock the deposit bag. Later in the morning, Ms. Musso would take the deposit bag to the bank where the bank teller would unlock the bag and return a bank statement reflecting the deposit amount to Ms. Musso.

Mr. Musso explained that originally the store's gas distributor was Exxon and that the cash deposit calculation was done a certain way. However, in approximately 2009, the store switched to Shell, and the cash deposit calculation was handled differently. Every day, a set amount of cash was put into the store's two cash registers, and a set amount was left in the safe allocated for change in pre-

3

counted tubes. During the day, if a cashier needed extra cash for making change, he or she would simply punch a button, and the extra money would drop from a tube directly from the safe. When the money in the till reached a certain amount, the cashier would then drop the excess amount into an inaccessible compartment of the safe. Mr. Musso explained that all of the money allocated for change was held in a separate compartment of the safe from the compartment that held the money "dropped" into the safe, which "goes all the way to the bottom." Each time a cashier dropped money into the safe, the computer generated a report with the time of the drop and the cashier's employee I.D.

At the end of the day, the amount of money taken out of the safe for change was the "paid-in." Mr. Musso explained:

> Because we had a reconciliation statement which took the G-SITE reports which were computerized, and they were reconciled to a day. And on that day report, there's a category called paid-in. On our Exxon statement, if you did $10,000 of revenue and you had $500 in safe paid-ins, your total revenue was $10,500.
>
> Under the Shell program, if you had $10,000 of revenue, paid-in didn't exist, you ended up having $10,000 of revenue.
>
> The difference was, was the paid-in category – and this is very important – that was the money paid from the safe to the register – was counted as revenue. When we switched to the Shell program, she kept counting that paid-in revenue. So she was basically taking the difference between the paid-in category and what was paid out. And every single day, almost without exception, she stole that amount of money.

By continuing to count the paid-ins as revenue on the daily, handwritten reconciliation sheets, Ms. Buteaux, he explained, was able to manipulate the calculation, making it appear as if the actual amount of money coming in was lower than it really was, and she just pocketed the difference.

4

Using a power-point, Mr. Musso demonstrated to the jury how the cash accounting used to be and how it should have been after the change of gas distributors. Then employing the Shell formula, he demonstrated why the paid-in figure was not supposed to be included in the daily reconciliation sheet. He then explained how he calculated the theft by taking the total revenue from the computer-generated printout (minuend) minus the total charges and paid-outs (subtrahend). The difference equaled the amount of cash that should have been deposited. Comparing that number with the actual deposits, as recorded in the bank receipts and reconciliation sheets, revealed the theft.

Detailing an attempt to catch Ms. Buteaux "red-handed," Mr. Musso explained how he and his wife went into the office after the store was closed and turned off the motion-activated surveillance camera. They then counted the cash in the safe and turned the camera back on before leaving. However, he testified that the "[n]ext morning, she figures out what happened and she calls my wife and says she's got a problem at home" and left the office to never return. Ms. Musso did the cash deposit that morning, and Ms. Buteaux was fired shortly thereafter. Mr. Musso explained that each morning, Ms. Buteaux would watch "the video between when she got off of work and the next morning only as it pertained to the office, because the office is the only place she can see if someone was going to do something that could catch her in the act, in my opinion."

From then on, Ms. Musso continued doing the cash deposits, and Mr. Musso testified that the business had been operating in the black since Ms. Buteaux was fired. Edward Landry, one of the co-owners, also testified that in the prior years, they had to refinance twice in order to keep the business running; however, after Ms. Buteaux was fired, the business could finally pay its bills.

5

Regarding the store's theft insurance, Mr. Musso testified that the store had maintained theft insurance for losses up to fifty thousand dollars per year. The store recovered in total a little over one hundred twenty thousand dollars for the years of 2010 to 2012. No losses were collected for 2013 because, for some reason, the store did not have theft insurance for that year. But based on his calculations, the store was "short" over "$35,000" between January and April 2013.

Mr. Musso further explained that in July 2011, Iberia Bank's fraud department called him and advised him that Ms. Buteaux's bank account showed an extraordinary number of cashier's checks issued to her by her son from the convenience store. As a result, Mr. Musso stopped employees from receiving cashier's checks issued from the store.

When questioned as to whether he had investigated any other employees as the potential thief, Mrs. Musso testified:

> Yes. Every day you have what's called a shift change report. So every person who works, say, 7:00 to 3:00, at the end of 3:00, they hit a button, and it gives you all their sales. And it can tell you whether they are over or short. That was looked at daily by Susan. So, if one cashier was short, you knew about it that day.

Any theft would have been caught in the daily review of the computer-generated shift change report, as reflected in the notations on the handwritten reconciliation sheets admitted into evidence.

Susan Musso's testimony was essentially the same as her husband's. She further explained that she would do the morning cash deposits and reconciliation sheets whenever Ms. Buteaux was absent, but could never get the figures balanced and did not know the computation formula had changed after the

6

switch in gas distributors. Ms. Buteaux, however, was always able to fix the problem when she returned to work. Ms. Musso also clarified that she had prepared the deposit slips nineteen or twenty times during the last two years Ms. Buteaux worked at the store, but only when Ms. Buteaux took time off.

When Ms. Musso was asked about certain notations in the reconciliation sheets, the following dialogue transpired:

> A. What it means is, occasionally an employee would not ring something up properly and you would have your report for each individual employee. And it would end up showing that they were over for their day or short for their day on their own individual reports. So it was easy to identify if somebody didn't ring something up.
>
> Q. And that writing in there refers to something like that happening?
>
> A. Right. Basically, what she was doing was keeping track of who wasn't doing the right thing all of the time. So she would write notes for us on there.
>
> Q. So, if anybody was stealing – other than Tanya were stealing, she would have caught it, right?
>
> A. There was – yes, she would have been the one to catch it, yes.

Regarding the daily deposits, Ms. Musso testified that Ms. Buteaux would create the daily handwritten reconciliation sheets and deposit slips:

> The deposit slip and the cash would be placed in the bank bag with a lock on it. And later in the day, some time during the morning, not on a regular schedule, I would show up and I would pick up the paperwork that was already processed and stapled together and the deposit. And I would bring that to the bank.

Once she "picked up that bag," Ms. Musso could not "get inside" it. "The tellers had the other key," and they would return the bag to her with a bank receipt after the cash was deposited.

Curry Rankin, a detective with the Iberia Parish Sheriff's Office, testified that he investigated the alleged thefts. The detective stated he received documents, which included paystubs and time sheets prepared by Mr. Musso, and also obtained Ms. Buteaux's bank records from January 2010 to July 2011. Detective Rankin testified that Ms. Buteaux's account at Iberia Bank was closed in July 2011, but that for the six months proceeding the closure, i.e., from January 2011 to July 2011, there was approximately fifty thousand dollars deposited into her account. He stated:

> Well, I believe in her case she was paid on a weekly basis. You have roughly half of what her annual salary would be. When you take into account the verifiable source of income that she has from Spanish Lake Market as opposed to what was being deposited, there was a major gap between the two.

The detective prepared a summary of deposits and expenditures for that six-month period. When he then compared it to the store's time sheets and the days that the money went missing, he "found consistencies," but did not elaborate on the consistencies. He agreed that Ms. Buteaux's bank records reflected several cashier's checks paid to the order of Ms. Buteaux from her son, Edjawaski Buteaux, noting that in the month of March 2011, there were fifteen cashier's checks made out to Ms. Buteaux from her son alone. A similar number of checks were made out monthly throughout the six-month period.

The detective did concede that he did not investigate any of the other employees, who were cashiers, because only Ms. Buteaux and the owners had access to the money kept in the safe. Moreover, Ms. Buteaux and Ms. Musso were the only ones to ever prepare the cash deposits. The detective agreed that he never interviewed Ms. Buteaux's family and had no idea what the household's necessary

expenditures were. He did attempt to interview Ms. Buteaux's son but was never able to locate him.

After the State rested, Ms. Buteaux testified in her defense and emphatically denied taking the money. She stated that she did the deposits as she was taught to do by Ms. Musso, and after the switch from one gas distributor to another, no one ever told her to do it differently. Because her son was bad at handling money, she explained how she had him buy cashier's checks from his earnings for her to deposit into her account to help him learn to manage his money. However, she stated that the bank forced her to close her account in July 2011 because all the cashier's checks "look[ed] suspicious." She also stated that her boyfriend, who was deceased at the time of trial, gave her money, as would her family members for joint vacations and various other reasons. Accounting for the expenditures from January 2010 to July 2011, Ms. Buteaux testified that she had two daughters living at home to support and that she would buy stuff for her son from the money he gave her. Ms. Buteaux did admit that she was the only employee who had access to the cash deposits and that she prepared the cash deposits and handwritten reconciliation sheets, except occasionally when Ms. Musso would do so because Ms. Buteaux was out for any reason. She further did not "dispute that the vast majority of the documents, over 95 percent of the documents that have been introduced with respect to these cash deposits" were in her handwriting.

Ms. Buteaux's mother, Lula Buteaux, agreed with Ms. Buteaux's testimony that she took care of her son's financials and that family members gave her money. The witness stated that if her daughter was living beyond her means, she would have noticed, and she pointed out Ms. Buteaux was still driving an old

vehicle. Ms. Buteaux's daughters, Muraya and Savannah Buteaux, also testified. They both stated that if their mother had in excess of two hundred thousand dollars over the three-year period, they would have noticed. Both girls believed they were constantly struggling financially.

After deliberations, the jury returned a unanimous guilty verdict on all three counts. The trial court sentenced Ms. Buteaux to five years at hard labor on each count to run concurrently with all but two years suspended. Upon release, the court ordered that Ms. Buteaux be placed on five years supervised probation, as a condition of which Ms. Buteaux had to "pay restitution in the amount of $89,186.63."

III.

**ERRORS PATENT**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent. In sentencing Ms. Buteaux, the trial court imposed restitution of $89,186.63 as a condition of probation, but a payment plan was not imposed. This court has held, however, that when restitution is required, a specific payment plan must be established. *State v. Wagner*, 07-127 (La.App. 3 Cir. 11/5/08), 996 So.2d 1203. Therefore, we remand this matter to the trial court for establishment of a payment plan for the $89,186.63 restitution. This plan may either be determined by the trial court or by the Office of Probation and Parole with approval by the trial court.

IV.

**LAW AND DISCUSSION**

Ms. Buteaux's sole contention on appeal is that there was absolutely no physical or direct proof that she stole the money from the business. As she contends, no one ever caught her stealing any money, and no one testified as to a money trail leading from the store to her. Therefore, Ms. Buteaux maintains that the verdict was based entirely on circumstantial evidence and that the State did not negate all reasonable hypotheses of innocence.[2]

At the outset, we note that Ms. Buteaux is correct in that there was no eyewitness to her theft or a paper trail showing the money leaving the convenience store and going into her account. The verdict, therefore, was rendered on circumstantial evidence, and the question before this court is whether that evidence was sufficient to support the convictions.

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), the Supreme Court set forth the constitutional standard for testing sufficiency of the evidence, requiring that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. Pursuant to La.R.S. 15:438, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."

> Circumstantial evidence involves, in addition to
> the assertion of witnesses as to what they have observed,

_____

[2] In brief, the State argues that Ms. Buteaux waived "this assignment by failure to adequately brief the issue." *See* Uniform Rules—Courts of Appeal, Rule 2-12.4(B)(4). However, we find that, though sparsely argued, Ms. Buteaux has sufficiently briefed this issue so to preserve her appeal.

11

a process of reasoning, or inference by which a conclusion is drawn. Like all other evidence, it may be strong or weak; it may be so unconvincing as to be quite worthless, or it may be irresistible and overwhelming. There is still no man who would not accept dog tracks in the mud against the sworn testimony of a hundred eye-witnesses that no dog passed by. The gist of circumstantial evidence, and the key to it, is the inference, or process of reasoning by which the conclusion is reached. This must be based on the evidence given, together with a sufficient background of human experience to justify the conclusion. Prosser, [LAW OF TORTS], at p. 212.

Consequently, before a trier of fact can decide the ultimate question of whether a reasonable hypothesis of innocence exists in a criminal case based crucially on circumstantial evidence, a number of preliminary findings must be made. In addition to assessing the circumstantial evidence in light of the direct evidence, and vice versa, the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*State v. Chism*, 436 So.2d 464, 469 (La.1983).

As noted above, the jury herein found Ms. Buteaux guilty of three counts of theft, which La.R.S. 14:67(A) defines as:

the misappropriation or taking of any thing of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

12

In reviewing the jury's verdicts, we are not required by constitutional law to determine whether we believe that the evidence establishes guilt beyond a reasonable doubt or even whether we believe the witnesses. *Jackson*, 443 U.S. 307; *State v. Mussall*, 523 So.2d 1305 (La.1988). Discretion in determinations of credibility is vested in the jury, which may accept or reject testimony within the bounds of rationality, and we will only impinge upon its discretion "to the extent necessary to guarantee the fundamental protection of due process of law." *Mussall*, 523 So.2d at 1310. Rather, we are charged in this case with reviewing the record to determine whether the evidence and the reasonable findings and inferences permitted by that evidence were sufficient to exclude every reasonable hypothesis of innocence. *Chism*, 436 So.2d 464.

To support the convictions, the State had to prove (1) a taking (2) of a thing of value (3) that belongs to another, (4) with the intent to permanently deprive the other of the thing. Through the admission of the computer-generated daily reports from the cash registers, the daily reconciliation sheets, and the daily deposit slips, the State presented sufficient proof that thousands of dollars were taken from the store from January 1, 2011, through April 31, 2013, and never returned. This in uncontroverted. What is in question is the identity of the perpetrator.

Our review of the record reveals that the perpetrator of the theft was proven by findings and inferences permitted by the evidence that, for the three years discussed above, Ms. Buteaux had almost exclusive access to the cash and checks in the safe and admittedly prepared the daily deposits and handwritten reconciliation sheets for that time period. From January 2010, to July 2011, her monthly bank statements consistently and substantially exceeded her reported

income. In an effort to explain why there was significantly more money in her account than her reported income, Ms. Buteaux testified that her son and sisters, who did not testify at trial, and her boyfriend, who was deceased at the time of trial, gave her money.

At trial, Mr. Musso was questioned about other employees' access to the cash deposits, and he testified that no other employee had access to the cash deposited in the safe or prepared the cash deposits or reconciliation sheets. This fact was not refuted by Ms. Buteaux who testified that only she and Ms. Musso prepared the cash deposits and had access to the cash drop part of the safe. She further admitted that she filled out the daily reconciliation sheets and corrected the sheets prepared by Ms. Musso in her absence.

Moreover, the evidence showed the discrepancies between the computer-generated revenue statements and the deposits, while at the same time revealing the consistencies between the actual deposits and the reconciliation sheets prepared by Ms. Buteaux. The consistencies were not present, however, when Ms. Musso prepared the reconciliation statements, and any overages were only rectified when Ms. Buteaux returned and corrected Ms. Musso's calculations.

The testimony and evidence further demonstrated how daily computer-generated shift change reports would have documented as well as alerted both Ms. Buteaux and Ms. Musso if any "cashier was short." And the discrepancies at issue herein were clearly evident when comparing the daily deposits, over which the cashiers had no control, to the difference between the computer-generated revenue minus the paid-outs and charged amounts. There is no dispute that the paid-ins were not supposed to be calculated in the reconciliation sheets under the Shell formula, and yet Ms. Buteaux admitted that she continued to

14

include that figure in her daily reconciliations. Her only explanation was that she was never told not to include it. Significantly, though, the amount that should have been deposited under the Shell formula and the actual deposits did not line up until Ms. Musso took over the preparation of the daily reconciliation sheets and omitted the previously included paid-in figures.

After hearing all the testimony, the jury apparently did not credit Ms. Buteaux's testimony and likewise rejected the defense's theory that the owners of the convenience store conspired to report loss of money by theft for the sole purpose of collecting insurance money. It was well within the jury's discretion to make these rational determinations based on the evidence and testimony.

Viewing the evidence in a light most favorable to the prosecution, we find that, though circumstantial, the evidence was sufficient for the jury to find the essential elements of the crime of theft perpetrated by Ms. Buteaux and that the State negated all reasonable hypothesis of innocence. Accordingly, we conclude that the evidence was sufficient to support an ultimate finding by the jury that the reasonable findings and inferences permitted by the evidence exclude every reasonable hypothesis of innocence, and, therefore, the evidence was sufficient to sustain the verdict of three counts of theft beyond a reasonable doubt.

V.

**CONCLUSION**

For the foregoing reasons, we affirm Ms. Buteaux's convictions and sentences, but remand this matter to the trial court for the establishment of a payment plan for the $89,186.63 restitution with instructions that this plan may

15

either be determined by the trial court or by the Office of Probation and Parole with approval by the trial court.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**